UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

DR. LISA TIBOR,

        Plaintiff,                                 Case No.

                                                    Hon.

v.

MICHIGAN ORTHOPAEDIC INSTITUTE,
a Domestic Professional Service Corporation,
WILLIAM BEAUMONT HOSPITAL,
a Domestic Not for Profit Corporation,

        Defendants.

---

DAVID M. BLANCHARD (P67190)
NAKISHA N. CHANEY (P65066)
NACHT, ROUMEL, SALVATORE
BLANCHARD & WALKER, P.C.
Attorneys for Plaintiff
101 N. Main Street, Ste. 555
Ann Arbor, MI 48104
(734) 663-7550
dblanchard@nachtlaw.com
nchaney@nachtlaw.com

---

**COMPLAINT AND JURY DEMAND**

NOW COMES Plaintiff, LISA TIBOR, by and through her attorneys, NACHT, ROUMEL, SALVATORE, BLANCHARD & WALKER, P.C., and hereby complains of Defendants, MICHIGAN ORTHOPAEDIC INSTITUTE and BEAUMONT HOSPITAL, as follows:

**PARTIES AND JURISDICTION**

1. Plaintiff Dr. Lisa Tibor, (hereinafter referred to as "Plaintiff" or "Dr. Tibor"), is a current resident of Burlingame, California.

2. Plaintiff is a former employee of Defendants Michigan Orthopaedic Institute and William Beaumont Hospital. Plaintiff is an orthopaedic surgeon, specializing in hip preservation and shoulder surgery.

3. Defendant Michigan Orthopaedic Institute (hereinafter referred to as "MOI" or "Defendants) is a domestic Professional Service Corporation operating out of Southfield, Michigan in the county of Oakland.

4. Defendant William Beaumont Hospital (hereinafter referred to as "Beaumont" or "Defendants") is a domestic Non Profit Corporation operating out of Royal Oak, Michigan in the county of Oakland.

5. The court has subject-matter jurisdiction in this action pursuant to 28 U.S.C. § 1331, 28 U.S.C. § 2601 et seq and 29 U.S.C. § 794(a).

6. Venue is proper in the Eastern District of Michigan pursuant to 28 U.S.C. § 1391(b), as it is the district in which Defendants conduct business.

7. Plaintiff brings this retaliation action on her own behalf under the False Claims Act, 31 U.S.C. §3729 et seq. This Court has jurisdiction over this case pursuant to 31 U.S.C. §§ 3732(a) and 3730(b). This Court also has jurisdiction pursuant to 28 U.S.C. §§ 1345 and 1331.

8. Plaintiff opposed Defendants' conduct violating of the Federal Anti-Kickback Law, 42 U.S.C. § 1320(a)-7(b), as well as the Stark Anti-Referral Law, 42

U.S.C. § 1395nn. Plaintiff refused to take part in illegal conduct, and she was fired in retaliation by Defendants.

## Introduction

9. Defendants pressured Plaintiff to sign a proposed recruitment agreement that was illegal under the False Claims Act and the Stark Anti-Referral Law.

10. Specifically, Defendants asked Plaintiff to sign a proposed recruitment agreement that was backdated over the thirty (30) day period in which Defendants had to have the agreement signed in order to be compliant under federal health care regulations pursuant to 42 CFR §411.353(g)(i).

11. On the advice from legal counsel, Plaintiff refused to sign the backdated recruitment agreement and was subsequently terminated by Defendants from a position for which she was induced to leave her home in California and under the promise that she would be employed for at least five (5) years by Defendants.

12. Plaintiff believed that signing the backdated agreement it would create an impermissible financial relationship between Defendants and Dr. Tibor and it would not fall within any available safe-harbor exception to the Stark Anti-Referral Law.

13. Such an impermissible financial relationship would make Plaintiff's services non-reimburseable by Medicare and render further Medicare billing for non-reimburseable services a false claim.

14. Defendants insisted that Plaintiff should backdate the agreement to cover up the impermissible agreement, with the intent that Defendants would continue to bill for her services in violation of the False Claims Act, 31 U.S.C. §3729 et seq.

15. Fraudulently backdating the recruitment agreement was also necessary to make Beaumont's guarantee of Dr. Tibor's pay appear Stark compliant.

16. When Plaintiff refused to take part in the above fraudulent activity, Defendants fired and ceased paying Dr. Tibor.

## General Allegations

17. Between August 28, 2012 and August 30, 2012, Defendants, Oakland Orthopaedic (an orthopaedic physician group working with Defendants) and Beverly Hills Orthopedists (an orthopaedic physicians group working with Defendants) met with Plaintiff regarding a possible employment arrangement with Defendants, Oakland Orthopaedic, and Beverly Hills Orthopaedic.

18. Defendants, Oakland Orthopaedic, and Beverly Hills Orthopedists were inducing Plaintiff to move from her home in California to Michigan to take a position as an orthopedic surgeon whose time would be split between Oakland Orthopaedic and Beverly Hills Orthopedists, in conjunction with Defendant Beaumont.

19. Prior to and at these meetings, Plaintiff had been informed that MOI, Oakland Orthopaedic, and Beverly Hills Orthopedists and others were forming an orthopedic "super group" for which Defendant Beaumont was the primary hospital.

20. Dr. Ira Zaltz informed Plaintiff prior to her moving from California to Michigan that the proposed super-group would include MOI, Oakland Orthopaedic Institute and Beverly Hills Orthopedists and other groups.

21. The formation of the proposed orthopedic super-group was to gain more power and influence to negotiate more favorable terms with Beaumont and fix prices for orthopedic services to patients of Defendant Beaumont.

4

22. In his role as Chief of Orthopedic Surgery at Beaumont, Dr. Harry Herkowitz was the main driving force behind the formation of the orthopedic super-group.

23. Dr. Herkowitz treated all orthopedic groups who would become part of the super-group as if they were interchangeable, made possible in part through a web of contracts, memoranda of understanding, recruitment agreements and other agreements by and between orthopeadic groups and/or Defendant Beaumont hospital.

24. In discussions with the Plaintiff regarding her employment with Defendants, Dr. Herkowitz would find Plaintiff employment at one of the orthopedic groups comprising the super-group.

25. As the Chief of Orthopedic Surgery at Beaumont, Dr. Herkowitz exercised power over each orthopedic group that used Defendant Beaumont as their primary hospital (groups that would later form the super-group).

26. In their initial conversation, Defendants offered to employ Plaintiff half time at Oakland Orthopaedic and half time at Beverly Hills Orthopedists, with potential salary support for one day of research with the Orthopedic Research Department at Defendant Beaumont.

27. About a month after her initial interview with Defendants and related orthopedic groups, Plaintiff was notified by Dr. Ira Zaltz of Oakland Orthopaedic that Beverly Hills Orthopedists had recently acquired a shoulder surgeon and would no longer need Plaintiff's services.

28. Subsequently on September 15, 2012, MOI and OOG agreed to consider employing Plaintiff half time at Defendant MOI and half time at Oakland Orthopaedic.

29. Plaintiff began to make arrangements to move from California to Michigan to work for Defendants.

30. On or around September 27, 2012, Plaintiff was told by Dr. Herkowitz, on behalf of Defendants, that her position would now be entirely at MOI because Oakland Orthopaedic was unwilling to employ another orthopaedic surgeon that would compete with their physicians.

31. In that conversation, Dr. Herkowitz explained that Michigan Orthopaedic Institute would agree to employ Plaintiff 100% of the time, despite the fact that OOI was no longer interested in participating in the employment agreement.

32. Defendants informed Plaintiff that her employment arrangements would be as follows: (1) two days per week doing clinical work at Defendant MOI; (2) one day per week of protected research; and (3) two days per week in the operating room at Defendant Beaumont as her clinical workload increased.

33. Plaintiff understood that Defendant Beaumont would provide the funding to Defendant MOI for her salary for the first year of the arrangement.

34. Defendant Beaumont was willing to fund Plaintiff's salary because Dr. Herkowitz (Chief of Orthopedic Surgery at Beaumont) wanted Plaintiff to assist Dr. Zaltz with his research being conducted at Beaumont, in addition to the clinical work for Defendants.

35. Defendants expressed that they would try to arrange for Plaintiff to have hospital privileges by November 1, 2012. Based on this arrangement, Plaintiff could begin practicing in Michigan and take the Orthopaedic Surgery Oral Board examination in July 2014 (as per the rules of the American Board of Orthopaedic Surgery).

36. For the credentialing process, Defendants required Plaintiff to become credentialed under the tax code that was created for the super-group.

37. On September 27, 2012, Plaintiff agreed to take the position with Defendants with the understanding that Defendant Beaumont would provide the funding to Defendant MOI for Plaintiff's salary for the first year.

38. In a subsequent conversation, Plaintiff was informed that Defendants would take care of her moving expenses from California to Michigan.

39. In early October, 2012, Plaintiff met with Diane Blackburn, Recruiter for Defendant Beaumont, regarding her employment with Defendants.

40. Plaintiff and Ms. Blackburn discussed her hospital privileges with Defendant Beaumont. Plaintiff was provided a packet of information regarding being a Defendant Beaumont physician.

41. On October 30, 2012, Plaintiff moved from California to Michigan, incurring thousands of dollars in traveling and moving expenses.

42. Based on Defendants' offer of employment, Plaintiff ceased efforts to find other lucrative employment opportunities.

43. On November 1, 2012, Plaintiff began her employment with Defendants and treated her first patient on November 8, 2012.

44. On November 26, 2012, Defendants sent Plaintiff "non-final" versions of proposed recruitment agreement and employment agreement.

45. The proposed recruitment agreement identifies Defendant Beaumont, Defendant MOI and Plaintiff as the parties entering into the agreement.

46. Plaintiff was concerned with the proposed recruitment agreement because it appeared that Defendant Beaumont was seeking concessions including a referral agreement whereby Defendant MOI would agree to forego competition in its imaging market and refer exclusively to Defendant Beaumont. Plaintiff also believed this to be a violation of the Stark Anti-Referral Law.

47. The proposed recruitment agreement stated that Defendant Beaumont would provide the "financial assistance" to enter into an "employment relationship" with the Plaintiff.

48. According to the proposed recruitment agreement, Defendant Beaumont agreed to pay Plaintiff two hundred and fifty thousand dollars ($250,000.00) for twelve months, with the expectation that Plaintiff would continue to work for Defendants or in the geographic catchment area for Defendant Beaumont for at least four years after the initial 12 month period.

49. The proposed "agreement" stated that the parties were entering into the agreement as of the "1st day of November 2012," the first day of Plaintiff's employment with Defendants.

50. On November 15, 2012, Plaintiff received her first paycheck from Defendants.

51. On December 13, 2012, Plaintiff contacted an attorney to discuss the proposed recruitment and employment agreements that she was to sign in conjunction with her employment with Defendants.

52. Plaintiff discussed the agreements with the Defendants many times throughout December of 2012.

53. Plaintiff believed that the recruitment agreement was potentially violating the Stark Anti-Referral Law and would put both Defendants and Dr. Tibor at risk for violating the False Claims Act.

54. Defendants had knowledge of Plaintiff's concerns with the proposed agreement and had been negotiating with Dr. Tibor to find a solution that would get the two agreements finalized by the end of 2012.

55. In an email dated December 28, 2012, Lucy Benham, legal counsel for Defendants, stated that if Plaintiff no longer wished to proceed with the recruitment agreement (which Plaintiff believed was illegal), Defendants would be willing to discuss alternate compensation plans with the Plaintiff.

56. Plaintiff reasonably believed that if she signed the proposed backdated recruitment agreement (more than six weeks after starting to work and receiving a salary) she would be violating the Stark Anti-Referral Law.

57. On January 11, 2012, Plaintiff's attorney notified Defendants that the proposed backdated agreement posed a compliance problem if the Plaintiff were to sign the backdated agreement.

58. Specifically, Plaintiff's attorney concerns were related to Defendants' position that Plaintiff was being asked to sign the backdated recruitment agreement that would be past the thirty (30) day period in which Defendants were supposed to have the agreement signed in order to be compliant under federal health care regulations pursuant to 42 CFR §411.353(g)(i).

9

59.     Since it was well over the thirty (30) days since Plaintiff began employment with Defendants, if Plaintiff signed the backdated agreement it would have been a violation of the Stark Anti-Referral Law and False Claims Act.

60.     On the advice of her legal counsel and her own knowledge, Plaintiff refused to sign the proposed backdated recruitment agreement because she believed it was an illegal contract.

61.     Three days later, Plaintiff spoke with Dr. David Collon and explained that she could not sign the backdated recruitment agreement because she believed it would be a violation of the Stark Anti-Referral Law.

62.     During this conversation, Dr. Collon informed Plaintiff that Defendants would agree to change the date of the agreement to January 1, 2013, in order to avoid any potential Stark violation.

63.     Later that same evening, Defendants reversed their position when Plaintiff received an email from Dr. Collon threatening that Dr. Tibor had to sign the backdated recruitment agreement in its present form (with the earlier date) by Friday morning.

64.     On January 11, 2013, Plaintiff's attorney sent an email to Defendants notifying them that it would be a violation of health care law if Plaintiff signed the backdated recruitment agreement.  Specifically, Plaintiff's attorney notified Defendants that:

> *"As I am sure you are aware, it is not only Dr. Tibor that has potential exposure under the Stark law, but the Practice physicians as well.  <u>Please review the attached materials and confirm for me in writing your legal position</u> that the parties executing the Recruitment Agreement at this point in time complies in all respects with the federal Stark law. <u>If this is the case, then I do not understand the Practice's resistance to an indemnification/hold harmless agreement and/or the Practice agreeing to include in Dr. Tibor's employment agreement</u>*

10

> *representations and warranties for Dr. Tibor to rely upon concerning Stark Compliance."*

65. The January 11, 2013 email attachments also stated that failure to have a signed written recruitment agreement in place that was "not inadvertent" requires that the parties obtain the required signature "within 30 consecutive calendar days immediately following the date on which the compensation arrangement became non-compliant."

66. Immediately following that email, Defendants notified Plaintiff's attorney that "*the revised Employment Agreement between Dr. Tibor and Michigan Orthopaedic Institute, PC that I emailed to you earlier today is hereby withdrawn pending further discussion between the parties.*"

67. Six days later, on January 17, 2013, Defendants terminated Plaintiff's employment for refusing to sign the backdated recruitment agreement, which Plaintiff and her legal counsel had objected to because they believed it to be illegal.

68. On the same day, Plaintiff was told by Dr. Ira Zaltz to "apologize" to the Defendants and say that the Plaintiff's attorneys had simply given Plaintiff "conservative advice."

69. Dr. Zaltz stated that Defendants may be willing to give Plaintiff back her job if she would just apologize and sign the fraudulently back-dated agreement.

70. After conferring with two more attorneys about the potential Stark Anti-Referral Law violation, Plaintiff emailed Defendants on January 23, 2013 and stated that she could not be part of an illegal agreement in order to keep her job with them.

71. Later, Dr. Zaltz called Dr. Tibor on behalf of the super-group to threaten withholding references and required communications for professional certification if Dr. Tibor sought to pursue this legal claim.

## COUNT I
## RETALIATION IN VIOLATION OF THE FALSE CLAIMS ACT

72. Plaintiff realleges and incorporates the previous paragraphs by reference.

73. The retaliation provision of the False Claims Act protects an employee or contractor from being "discharged, demoted, suspended, threatened, harassed, or in any other manner discriminated against in the terms and conditions of employment because of lawful acts done by the employee, contractor, agent or associated others in furtherance of an action under this section or other efforts to stop 1 or more violations of this subchapter." 31 U.S.C. § 3730(h).

74. Relief for violating this section includes reinstatement of the employee, contractor, or agent with the same level of seniority that person would have had but for the discriminatory conduct, as well as double damages for back pay, interest on back pay, and special damages. Relief also includes reasonable attorneys' fees. *Id.* § 3730(h)(1)(b).

75. Plaintiff was terminated for refusing to take part in a fraudulent employment contract which she believed to be illegal and would result in fraudulent billing under the Stark Anti-Referral Law.

76. Plaintiff objected that by signing the backdated agreement it would be a violation of the Stark Anti-Referral Law because it would represent a compensation arrangement that did not meet an exception under the Stark Anti-Referral Law.

77. For the reason that any billing submitted to the government for her services would represent a False Claim to the government, Plaintiff refused to sign the backdated agreement.

78. Plaintiff voiced her opposition to Defendants about signing the backdated recruitment agreement due to violations of the Stark Anti-Referral Law.

79. Plaintiff was subsequently terminated from her employment with Defendants.

80. Dr. Tibor has been harmed and continues to be harmed in that she has and will continue to suffer economic damages, as well as humiliation, outrage, and loss of professional reputation, as a result of Defendants' actions.

## COUNT II
## DISCHARGE IN BREACH OF PUBLIC POLICY
### (under Michigan law)

81. Plaintiff realleges and incorporates the previous paragraphs by reference.

82. Plaintiff was terminated for refusing to sign the backdated agreement which she believed to be illegal under the Stark Anti-Referral Law.

83. Plaintiff reasonably objected to the backdated arrangement forced on her by Defendants because it would violate the Stark Anti-Referral Law as it would represent a compensation arrangement that did not meet an exception under the Stark Anti-Referral Law, and she refused to take part in conduct in furtherance of fraudulent billing to the Government.

84. Dr. Tibor has been harmed and continues to be harmed in that she has and will continue to suffer economic damages, as well as humiliation, outrage, and loss of professional reputation as a result of Defendants' actions

## RELIEF REQUESTED

WHEREFORE, Plaintiff Dr. Lisa Tibor requests the following relief from this Honorable Court against Defendants Michigan Orthopaedic Institute and William Beaumont Hospital:

a) A judgment against Defendants in an amount consistent with the damages sustained, in excess of Twenty-Five Thousand ($25,000.00) dollars, including but not limited to back pay, front pay, liquidated damages, emotional distress damages, punitive damages;

b) A judgment for costs and attorney fees in favor of the Plaintiff; and

c) Such other relief at law or equity as the Court may deem just and proper.

Respectfully submitted,
NACHT, ROUMEL, SALVATORE,
BLANCHARD & WALKER, P.C.

/s/ David M. Blanchard
David M. Blanchard (P67190)
Attorney for Plaintiff
101 N. Main Street, Ste. 555
Ann Arbor, MI 48104
(734) 663-7550
dblanchard@nachtlaw.com

Dated: February 28, 2014

**DEMAND FOR JURY TRIAL**

NOW COMES Plaintiff, Dr. Lisa Tibor, by and through her attorneys, NACHT, ROUMEL, SALVATORE, BLANCHARD & WALKER, P.C. and hereby demands a jury by trial in the above-captioned matter.

                                                Respectfully submitted,
NACHT, ROUMEL, SALVATORE,
BLANCHARD & WALKER, P.C.

/s/ David M. Blanchard
David M. Blanchard (P67190)
Attorney for Plaintiff
101 N. Main Street, Ste. 555
Ann Arbor, MI 48104
(734) 663-7550
dblanchard@nachtlaw.com

Dated: February 28, 2014